Filed 12/22/15  In re N.L. CA3

## NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Butte)

----

| | |
|---|---|
| In re N.L., a Person Coming Under the Juvenile Court Law. | C077394 |
| BUTTE COUNTY DEPARTMENT OF EMPLOYMENT AND SOCIAL SERVICES, | (Super. Ct. No. J36123) |
| Plaintiff and Respondent, | |
| v. | |
| M.L., | |
| Defendant and Appellant. | |

Mother of minor N.L. appeals from three juvenile court orders issued at two different hearings.  The first two orders decided motions to modify adversely to her position on September 11, 2014, and the third order terminated her parental rights to N.L. on January 8, 2015.  For reasons we explain, we affirm the three orders.

1

## FACTUAL AND PROCEDURAL BACKGROUND

Between 1998 and 2011, there were 36 referrals for this family to child protective services, for sexual abuse, neglect, drug use, and physical abuse. In 2011, the minor's older half-sister, then 15, reported she was raped by her father (Tommy, the minor's stepfather) and that Tommy had been sexually molesting her since she was two years old. Subsequent investigation revealed that Tommy had also repeatedly raped and molested the minor's older half-brother, then 12, who in turn had tried to rape the youngest of the minor's three half-siblings, Vanessa, then 11. Vanessa had been reported in the past to be acting out sexually with the minor. The minor, then five, was afraid of returning to Tommy's care, and Tommy had threatened to harm the children if he did not get custody of them. Accordingly, on November 2, 2011, the Butte County Department of Social Services (Department) filed a Welfare and Institutions Code section 300 petition alleging the minor was a child described by section 300, subdivisions (b) and (j).[1] Mother continued to allow Tommy access to the minor, despite the presence of restraining orders prohibiting contact between the two, and the juvenile court removed the minor from mother's custody at the end of December 2011.

The minor and his half-sister, Vanessa, were placed together in a foster home in January 2012. The foster parents almost immediately reported concerns that Vanessa was physically and emotionally abusive to the minor. The two older siblings, then ages 13 (boy) and nearly 16 (girl) were erratic and emotionally unstable; they were placed in group homes and struggled in multiple placements. The boy was also facing criminal charges.

---

[1] Further undesignated statutory references are to the Welfare and Institutions Code.

In March 2012, the juvenile court found the allegations of the petition true. Initially, although mother's visits were supervised, she saw the minor at least once a week and had supervised phone visits with him. As we detail *post*, visits did not always go well from the beginning of the case, and diminished in quantity and deteriorated in quality thereafter, culminating in the Department's successfully petitioning the juvenile court to terminate mother's visitation in mid-2014.

On December 19, 2012, the juvenile court terminated mother's reunification services, finding that mother suffered from a mental disability as described in Family Code section 7827, subdivision (a), which "renders her incapable of utilizing those services." Before the hearing, therapist Dawn Horwitz-Person, who was treating the children as well as mother at the time, submitted a letter to the Department declining to continue working with mother, declaring a conflict of interest as mother was "undermining the process" of healing her children, and "hindering their social and emotional development." Horwitz-Person noted that mother "has been diagnosed as hav[ing] a personality disorder by myself as well as two other independent professionals" and that "she has continued to talk to the children about issues that she has been reprimanded for on numerous occasions by social workers, therapists, and the courts. It is now truly affecting the children's well being and treatment." Horwitz-Person continued to work with the minor. Mother continued to visit him and the other children, although with reduced frequency.

The minor's presumed father (not Tommy) was still receiving services long after mother's ceased. His services were ultimately terminated in June 2014.

Because of Vanessa's ongoing and escalating verbal and physical aggression toward the minor, the foster home gave notice and the Department moved Vanessa to her maternal grandmother's home in November 2013. Both children appeared to benefit from being in separate homes. In February 2014, mother petitioned the juvenile court to modify its order that the minor remain in his foster home and instead move him to his

grandmother's home to live there with Vanessa.  We detail mother's unsuccessful petition *post* in the Discussion.

On June 25, 2014, the Department filed a section 388 petition to modify, seeking to end mother's visitation.  The petition cited the order to be changed as a June 2014 visitation order, but alleged changed circumstances in detail on the face of the petition beginning with October and November 2013 incidents and continuing with problematic visits in January and May 2014.  This petition was ultimately granted in September 2014, but the court permitted visits to remain suspended from the time of the petition's filing.

On January 8, 2015, the parties appeared for the selection and implementation hearing.  The minor had been living with his prospective adoptive family for three years and was doing well in their home.  He called them "mom and dad" and had strong emotional ties to both, particularly the foster mother.  Mother did not present any evidence at the hearing.  The attorney for Vanessa and the older half-sister objected to termination of parental rights based on sibling relationships, although mother did not object on that basis.  The siblings presented no additional relationship evidence.  The minor's attorney recommended following the Department's recommendation to terminate parental rights.  The court did not specifically address the objection based on sibling relationships, but found the minor adoptable and terminated parental rights.

## DISCUSSION

### I

*Petitions to Modify*

Section 388 permits modification of a dependency order if the moving party demonstrates a change of circumstance or brings forth new evidence *and* if the proposed modification is in the best interests of the minor.  (*In re Kimberly F*. (1997) 56 Cal.App.4th 519, 526.)  The party petitioning for modification has the burden of proof by a preponderance of the evidence.  (*In re Stephanie M*. (1994) 7 Cal.4th 295, 317.)  The best interests of the child are of paramount consideration when a petition for modification

4

is brought after termination of reunification services. (*Ibid.*) In assessing the best interests of the child, the juvenile court looks to the needs of the child for permanence and stability. (*Ibid*.) Determination of a petition to modify is committed to the sound discretion of the juvenile court and, absent a showing of a clear abuse of discretion, the decision of the juvenile court must be upheld. (*Id*. at pp. 318–319; *In re Robert L.* (1993) 21 Cal.App.4th 1057, 1067 [extending broad discretion to the juvenile court's determination regarding relative placement].)

A. *Terminating Mother's Visitation with Minor*

1. **History**

From the beginning of the case, mother's behavior during visits was unpredictable and inconsistent. She made inappropriate statements and these statements negatively affected the children's stability in their placement and treatment. Even during telephone visits, she upset the children by "telling them she has been crying all night and asking them if they miss her." She told the children they did not have to follow the rules about telephone time limitations. After some visits, the minor complained of bad dreams. He had full body stress-induced hives after another family visit. He refused some of mother's phone calls. Mother argued with the social worker, and complained about the minor's foster parents, claiming they were not doing "their job" in front of the minor.

As early as March 2012, Horwitz-Person recommended suspending mother's visits because the children were very angry with mother for not protecting them and mother had violated the visitation agreement by discussing Tommy. Horwitz-Person later amended her recommendation to allow weekly visitation so the children could be assured their family members were all right. In December 2012, she characterized mother's interaction with the children as detrimental to them, as we described *ante*. In May 2013, Horwitz-Person opined that visits with mother were negatively impacting the children's placements.

In October 2013, Horwitz-Person confirmed she still believed continued visitation between the children and their mother was detrimental to the children, opining that the visits confused and angered them. The Department first asked the court to end the minor's visits with mother that same month, but the original visitation order apparently remained in place. Horwitz-Person's assertion later formed one of the articulated bases for the Department's petition to modify the visitation order. In November 2013, mother refused to sign visitation guidelines, reflecting the agreement to refrain from making promises about visits, expressing her concerns about the case to the children, and discussing court hearings with them.

In January 2014 during a supervised family visit, the minor appeared uncomfortable with his older brother and also when discussing his foster home. Mother made several comments criticizing the foster parents and tried several times to discuss the case and her visitation schedule with the minor. She then became very confrontational with a social worker, who ended the visit early as a result.

At a May 2014 visit between only the minor and mother, she began criticizing the foster parents and stating she was going to seek additional visitation. The social worker asked her not to discuss the case in front of the minor and mother stood up, raised her voice and said: "I can say what I want. He is my child and you don't tell me what to say." The social worker indicated she was ending the visit and mother "postured aggressively, blocked the doorway and pulled her arm back as if to hit me." The minor witnessed the interaction and started crying. Mother left the building then returned multiple times, yelling and cursing at the social worker, calling her "worthless" and a "bitch" while the minor grew more distressed. The social worker called 911. The minor was crying after the visit, worried his mother was going to jail. He told his therapist that it was a bad visit which ended because his mother could not follow the rules.

## 2. **Hearing**

Various witnesses testified at the hearing on the petition to modify. The social worker who supervised both the January and May 2014 visits testified. She had also supervised approximately four other visits between mother and the minor, which went well. As to the May 2014 visit, she testified as outlined above--that mother had been violating the visitation rules and had become angry with the social worker for attempting to stop her. As the confrontation escalated, the minor appeared frozen in place. The confrontation lasted about 20 minutes before the social worker called 911 and mother finally left and did not return.

The primary social worker on the case, Aurora Navarro, testified that she believed the visits between mother and the minor had become detrimental to him. Mother continued to tell him he would return home. This confused the minor and gave him false hope. Navarro had also spoken again with Horwitz-Person, who agreed visits with mother were detrimental to the minor and should be terminated. As she had indicated in October 2013, Horwitz-Person continued to believe the visits were confusing to the minor and detrimental to him emotionally when negative comments were made about his foster parents. The social worker noted that the minor was headed toward permanence and mother's continuing criticism of the foster parents interfered with his placement with them.

The adoptions worker testified that she believed continued contact with mother would be detrimental to the minor. She based her opinion on the change in behavior she had seen in him over the preceding 18 months, the visits she had observed, her conversations with Horwitz-Person, and her observations of mother's behavior. Mother's behavior in the visits agitated the minor and caused conflict in his current placement. The worker believed mother viewed the children's agitation as a benefit, because when they get agitated they are more reliant on her and the other children have ended up either back home with her or with grandmother. The more contact the minor had with mother

7

and the siblings, the more agitated he became, and she was concerned for the security of his placement. The foster family reported the minor frequently struggled after visits; he was agitated, less compliant, and had nightmares.

### 3. **Findings**

The juvenile court found that the minor was suffering emotional harm from the visits which constituted detriment, and ended visitation between mother and the minor. The court cited the minor's reaction to the May 2014 visit as well as the conclusions of Horwitz-Person and multiple social workers that continued visits would be detrimental to the minor. Further, the court found that continuing visits between mother and the minor would be disruptive to the minor's placement, which, given the stability and duration of the placement, would be a risk to the minor. The visits themselves were unpredictable, some being without incident and others having serious confrontations and arguments. This unpredictability itself put the minor at risk of emotional harm which could also disrupt his placement. Based on this evidence, the court found the visits between mother and the minor were detrimental to the minor.

### 4. **Law and Analysis**

Mother contends the juvenile court erred in granting the Department's petition, arguing there was no evidence of changed circumstances showing ending visits with mother was in the minor's best interests. Specifically, mother correctly points out that the Department's petition indicated the order sought to be changed was a June 18, 2014 order, while the evidence cited by the Department in its petition and presented at the hearing detailed events occurring long before the order from which the Department purported to seek relief. Mother argues, again correctly, that these events did not evidence a change from the *June 2014 order*.

The Department ignores this issue in its briefing, arguing only broadly and briefly that there were changed circumstances, but not addressing the disparity in dates. Nor did any party raise this precise issue in the juvenile court, as far as we can determine. The

8

June 18 minute order does reference visitation, but the transcript of the hearing that day makes clear the parental visitation order is relative to father, not mother. Sibling visits were discussed, as was the issue with mother's May 2014 visit going badly. The juvenile court continued the hearing and continued the sibling visitation orders then in place. Although the June 18 minute order also continues all current orders not in conflict, of which mother's visitation order is apparently one, we agree that the petition incorrectly designated the order to be modified as the June 18 order rather than mother's original visitation order. However, as we explain, the error was of no moment.

It is obvious from the face of the petition--arguing changed circumstances in October and November 2013 as well as January and May 2014--that the Department was seeking to modify the latest order specifically continuing mother's visits with the minor, albeit at the Department's discretion, as well as any subsequent reiterations of that order. It is also clear from the testimony and arguments at the hearing that all parties were aware the Department was seeking to show changed circumstances between the order permitting mother to visit the minor and the present time, no matter the specific date on that (visitation) order. The incorrect designation of the order the Department sought to modify had no effect on the ultimate disposition of the petition.

Mother next argues that it was the cessation of visits rather than mother's conduct that caused detriment to the minor. She argues that Horwitz-Person "set the agenda" and influenced the court to end mother's services as well as her visits.

We first note that Horwitz-Person was not alone in her opinion of mother's dysfunctional and harmful relationship with her children. Two mental health professionals separately agreed that mother was unable to benefit from services due to her personality disorders and self-control issues. The first psychologist to evaluate her found that she lacked insight, had poor judgment, and "assumed no 'concrete level of responsibility for the situation her children are in, and her understanding of the pathology that seems to define her family was alarmingly lacking.' " The second found that she

9

was " 'lacking in critical skills that would otherwise allow her to consistently put (her children's) needs above her own' " and unable to protect her children.

Next, we agree with mother that the decision to end visits between parent and child is not one to be made without careful consideration. Visitation between parent and child is an essential component of a reunification plan, even if actual physical custody is not the outcome of the proceedings. (*In re Luke L.* (1996) 44 Cal.App.4th 670, 679.) However, "[n]o visitation order shall jeopardize the safety of the child." (§ 362.1, subd. (a)(1)(B).) It is ordinarily improper to deny visitation absent a showing of detriment. (*In re Luke L.*, *supra*, 44 Cal.App.4th at p. 679; *In re David D.* (1994) 28 Cal.App.4th 941, 954.) We "giv[e] full effect to the respondent's evidence, however slight, and disregard[] the appellant's evidence, however strong.' [Citation.]" (*Sheila S. v. Superior Court* (2000) 84 Cal.App.4th 872, 881.) "We have no power to judge the effect or value of the evidence, to weigh the evidence, to consider the credibility of witnesses . . . ." (*In re Casey D.* (1999) 70 Cal.App.4th 38, 52-53.)

The juvenile court heard extensive evidence, which we have summarized *ante*, of the problems mother's visits with the minor were causing for everyone involved. She refused to sign and follow orders and behaved in an unacceptable fashion at the visits, despite additional restrictions and warnings. The primary social worker, the adoptions specialist, and the minor's therapist all agreed his visits with mother were emotionally detrimental to him. They left him confused, sad, and angry, and put his otherwise stable placement at risk. "Detriment includes harm to the child's emotional well-being." (*In re Brittany C.* (2011) 191Cal.App.4th 1343, 1357.) Although mother correctly points out that the facts demonstrating detriment here are less egregious than seen in *In re Brittany C.* and certain other published cases finding emotional detriment, here too detriment from visits was adequately demonstrated such that substantial evidence supports the ruling. We cannot say any abuse of discretion appears, as the juvenile

10

court's ruling reflects a thorough consideration of the evidence and clear understanding of the appropriate standards on hearing a petition to modify.

B.      *Declining to Place Minor with Grandmother*

1. **History**

The maternal grandmother had monthly visits with the minor. She had been hostile with the minor's foster parents and disregarded limitations placed on phone calls. She had allowed unauthorized conduct between the minor and mother, and also allowed Vanessa to sleep in the minor's room despite knowing of the Department's concern regarding sexualized behaviors exhibited toward the minor by Vanessa. Although Vanessa was living with grandmother, Vanessa was six years older than the minor and able to establish her own clear boundaries. The minor could not yet keep himself safe and set his own boundaries. The Department was also concerned about grandmother's inability to set boundaries with mother and to protect the minor from mother. The social worker also doubted grandmother could or would properly control Vanessa's aggressive behavior toward the minor, as grandmother continued to minimize the behavior, characterizing Vanessa's conduct as "overprotection" of her little brother.

2. **Hearing**

Adoption worker Lenette Dornan testified that she had been informed of Vanessa's aggressive behavior toward the minor by the foster parents and had witnessed some of it herself. The minor was doing very well since Vanessa had been removed from the foster home, and did not appear to be having any adverse reactions. Dornan did not believe it was in the minor's best interest to be removed from the foster home and placed with grandmother. The two children had very different developmental needs and some of grandmother's success in maintaining boundaries for Vanessa was because of Vanessa's clarity in setting those boundaries. She did not believe the minor would be able to set those boundaries. She was also concerned grandmother would not be able to keep the minor safe from mother. Part of her concern in terms of grandmother's ability to keep

11

the minor safe related to an overnight visit that occurred over Christmas. Mother was not allowed to have contact during the visit and the minor was to sleep in his room alone. The minor reported he saw his mother during the visit and that Vanessa slept on the floor in the same room as he did. In addition, he had been in his placement for over two years and was doing very well. It would be detrimental to the minor to remove him from the foster home.

Mother testified the minor and Vanessa were very close and it was detrimental for them not to be placed in the same home together. She did not believe Vanessa bullied the minor, but that the issues were typical sibling issues.

Grandmother testified that she visited the minor once a month, and had regular telephone contact with him, up to three days a week. She testified the bond between Vanessa and the minor was very strong. She claimed the disputes between them were typical as between siblings. She believed it was in the minor's best interest to live with her, and believed she could create and maintain boundaries between the children and mother. The older sister testified she believed maternal grandmother would enforce the boundaries to the best of her ability but also indicated some boundaries had been crossed in the past. This included allowing Vanessa's boyfriend to stay at her house. The older brother testified he believed it was in the minor's best interest to be placed with the grandmother.

Vanessa also testified she thought the minor should be placed with the maternal grandmother. She acknowledged she did not have as good a relationship with the minor as others were saying. She did not want to be around him, and because of their six year age difference, they were not interested in the same things. She also admitted she had verbally abused the minor and took out her anger at the other children in the foster home on him.

12

The primary social worker testified the grandmother had not always abided by the guidelines relative to Vanessa and mother, in terms of visits and contact with mother. The social worker also observed during visits Vanessa was impatient with the minor and yelled at him. She did not perceive any damage to the relationship between the siblings from being placed in separate homes. She did not believe it was in the minor's best interest to place him with grandmother. She believed the placement would put him at risk of emotional harm, based on the physical aggression and hostility of mother toward grandmother and grandmother's inability to set limits with mother. She also believed he was at risk of harm in that Vanessa would continue to bully him. Further, due to the previous history of sexual acting out, the social worker was concerned that behavior could recur. Grandmother was aware of a sexual incident between Vanessa and the minor, but did not inform the social worker and in fact, denied anything had happened. Grandmother also minimized the level of aggression shown by Vanessa to the minor; the social worker was concerned the grandmother would not be able to protect the minor from that aggression and he could be physically or emotionally harmed. She also did not believe grandmother would be able to keep mother away from the minor.

3. **Findings**

The juvenile court explicitly found based on Vanessa's testimony that she and the minor did not share a particular bond. Nor did the testimony of any of the children suggest there was such a meaningful bond between the older siblings and the minor that his placement should be disrupted. The testimony of the social workers, Navarro and Dornan, corroborated that view of the lack of a sibling bond. The court noted its concern that grandmother was minimizing the behavior of Vanessa toward the minor. The court characterized grandmother's testimony as evasive and expressed concern that she would not be forthcoming with the Department and court if the minor were placed with her. The court was also concerned that grandmother would not be able to protect the minor either from mother or Vanessa. The court found it was in the minor's best interest to not

13

be moved from his foster home, and it would be detrimental to move him to grandmother's home.

### 4. **Law and Analysis**

Mother contends the juvenile court abused its discretion in denying her petition to place the minor with his grandmother. She contends placement with a suitable relative is presumptively in the child's best interest and the evidence did not support the juvenile court's finding of best interest regarding the minor's placement.

"In any case in which a child is removed from the physical custody of his or her parents pursuant to Section 361, preferential consideration shall be given to a request by a relative of the child for placement of the child with the relative. . . ." (§ 361.3, subd. (a).) " 'Preferential consideration' means that the relative seeking placement shall be the first placement to be considered and investigated." (§ 361.3, subd. (c)(1).) "Preferential consideration 'does not create an evidentiary presumption in favor of a relative, but merely places the relative at the head of the line when the court is determining which placement is in the child's best interests.' [Citation.]" (*In re Antonio G.* (2007) 159 Cal.App.4th 369, 376.) "[T]he statute express[es] a command that relatives be assessed and *considered* favorably, subject to the juvenile court's consideration of the suitability of the relative's home and the best interest of the child." (*In re Stephanie M.*, *supra*, 7 Cal.4th at p. 320.) But this command is not a guarantee of relative placement. (*In re Joseph T.* (2008) 163 Cal.App.4th 787, 798.)

The statute also identifies several factors that the social services agency and the juvenile court must consider in determining whether placement with a particular relative who requests such placement is appropriate. (§ 361.3, subd. (a).) Among others, these factors include the relatives ability to: provide a safe, secure, and stable environment for the child; exercise proper and effective care and control of the child; and, protect the child from his or her parents. (§ 361.3, subd. (a)(7)(A), (B), & (D).) "During the reunification period, the preference applies regardless of whether a new placement is

14

required or is otherwise being considered by the dependency court." (*In re Joseph T.*, *supra*, 163 Cal.App.4th at p. 795.)

Here, because reunification services were still being provided to minor's father at the time the petition was filed--although the hearing was conducted well after his services were terminated--the relative placement preference applied. (See *In re Joseph T.*, *supra*, 163 Cal.App.4th at pp. 794-795.) However, as we have noted, the question remains whether placement with grandmother was in the minor's best interests. We conclude the juvenile court did not abuse its discretion in deciding it was not.

The juvenile court heard extensive evidence, which we have summarized *ante*, of the problems the minor had with Vanessa, including sexual acting out, and the grandmother's lack of concern with the behaviors. Grandmother also had a history of not complying with the Department's guidelines. The social workers did not believe grandmother would be able to keep mother from the minor, for reasons we have described. The minor was young and unable to protect himself from mother or establish his own boundaries relative to their contact. In addition, the minor had been placed in his foster home for almost three years at that time. He was doing very well in the home and had a strong bond with his foster parents. No abuse of discretion appears.

II

*Termination of Parental Rights*

Mother contends the juvenile court erred in terminating her parental rights without applying the sibling bond exception to adoption. As we noted *ante*, two of the half-siblings objected to termination of parental rights based on sibling relationships but mother remained silent as to that specific issue, although she did argue about continued inter-sibling visitation at the selection and implementation hearing.

15

A. *The Law*

At the selection and implementation hearing held pursuant to section 366.26, a juvenile court must choose one of the several " 'possible alternative permanent plans for a minor child . . . . *The permanent plan preferred by the Legislature is adoption.* [Citation.]' [Citation.] If the court finds the child is adoptable, it *must* terminate parental rights absent circumstances under which it would be detrimental to the child." (*In re Ronell A*. (1996) 44 Cal.App.4th 1352, 1368.) There are only limited circumstances which permit the court to find a "compelling reason for determining that termination [of parental rights] would be detrimental to the child." (§ 366.26, subd. (c)(1)(B).) The party claiming the exception has the burden of establishing the existence of any circumstances which constitute an exception to termination of parental rights. (See *In re Cristella C*. (1992) 6 Cal.App.4th 1363, 1372-1373; *In re Melvin A*. (2000) 82 Cal.App.4th 1243, 1252 ["The parent has the burden of proving that termination would be detrimental to the child"]; Cal. Rules of Court, rule 5.725(d)(4); see Evid. Code, § 500.)

One of the limited circumstances in which termination of parental rights may be detrimental to the minor is when "[t]here would be substantial interference with a child's sibling relationship, taking into consideration the nature and extent of the relationship, including but not limited to, whether the child was raised with a sibling in the same home, whether the child shared significant common experiences or has existing close and strong bonds with a sibling, and whether ongoing contact is in the child's best interest, including the child's long-term emotional interest, as compared to the benefit of legal permanence through adoption." (§ 366.26, subd. (c)(1)(B)(v).) The court must consider the interests of the adoptive child, not the siblings in determining whether termination would be detrimental to the adoptive child. (*In re Daniel H*. (2002) 99 Cal.App.4th 804, 813; *In re Celine R*. (2003) 31 Cal.4th 45, 49-50.)

16

"To show a substantial interference with a sibling relationship the parent must show the existence of a significant sibling relationship, the severance of which would be detrimental to the child. Many siblings have a relationship with each other, but would not suffer detriment if that relationship ended. If the relationship is not sufficiently significant to cause detriment on termination, there is no substantial interference with that relationship." (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 952, fn. omitted.)

B. *Analysis*

Mother did not object to termination on this basis in the juvenile court. Her claim on appeal that the sibling relationship exception to adoption applied to the minor is therefore forfeited. (*In re Erik P.* (2002) 104 Cal.App.4th 395, 402-403.) However, because the half-siblings did make the objection and the court addressed it, so shall we, albeit briefly.

It appeared the minor had a limited and unhealthy relationship with his half-siblings. The siblings ignored him during the visits and spoke negatively of his potential adoptive home. The minor did not request additional contact with his siblings. He had no adverse behaviors since Vanessa moved. Adoption Services found adoption would not create a substantial interference in the sibling relationships and would not be detrimental to the minor. As we have described, at the hearing on placement with grandmother, the juvenile court explicitly found based on Vanessa's testimony that she and the minor did not share a particular bond. Nor did the testimony of any of the children suggest there was such a meaningful bond between the older siblings and the minor. The testimony of the social workers, Navarro and Dornan, corroborated that view of the lack of a sibling bond. The adoption worker had supervised "hundreds" of sibling visits, and observed the visits were atypical in that the older children did not engage with the minor for any significant period of time. In fact, she testified that the minor asked her and the other visit supervisor to play with him at times instead of family members.

17

There was simply no evidence of a significant sibling relationship here.  The minor was removed from the home when he was five years old and lived the next three years in his foster home.  His siblings were six, seven and one-half, and 10 years older than he, respectively.  Neither of the older siblings was ever placed with him, and his interactions with Vanessa were not often emotionally healthy, as we have described.  The minor showed no adverse reaction to living separately from Vanessa; in fact, he was doing quite well.  Vanessa herself testified that she and the minor did not have a particularly close relationship and did not share interests.  On this record, the court properly concluded no exception to termination of parental rights had been established and did not err in terminating parental rights.

## DISPOSITION

The orders of the juvenile court are affirmed.


                                                 /s/
                                           Duarte, J.


We concur:


   /s/
Butz, Acting P. J.


   /s/
Hoch, J.